329 F.2d 402
 TEXAS TUNNELING COMPANY, Plaintiff-Appellee and Cross-Appellant,
v.
CITY OF CHATTANOOGA, TENNESSEE, Defendant-Appellee,
William A. Havens, Alfred W. Burger, Harry H. Moseley, Jasper W. Avery, Frank S. Palocsay and Edward S. Ordway, d/b/a Havens and Emerson, Defendants-Appellants and Cross-Appellees.
 No. 15075.
 No. 15076.
 United States Court of Appeals Sixth Circuit.
 March 24, 1964.
 
 Robert L. McMurray, Chattanooga, Tenn., Donald L. Halladay, Chattanooga, Tenn., on brief; Noone, Moseley & Noone, Chattanooga, Tenn., of counsel, for Texas Tunneling Co.
 W. A. Wilkerson, Chattanooga, Tenn., Wilkerson & Abshire, Chattanooga, Tenn., of counsel, for Havens and Emerson.
 Ellis K. Meacham, Chattanooga, Tenn., Anderson, Meacham & Barger, Chattanooga, Tenn., for City of Chattanooga, Tenn.
 Before CECIL and O'SULLIVAN, Circuit Judges, and McALLISTER, Senior Circuit Judge.
 O'SULLIVAN, Circuit Judge.
 
 
 1
 This case involves an appeal by defendant-appellant, Havens and Emerson, from a judgment for plaintiff-appellee, Texas Tunneling Company. The action is for damages resulting from an alleged negligent misrepresentation in the furnishing of an engineering survey, which plaintiff claimed to have relied upon to its detriment. The survey was used by plaintiff in negotiating a subcontract for digging a tunnel as a part of the work involved in the construction of an interceptor sewer by the City of Chattanooga, Tennessee. Also involved is plaintiff's cross-appeal from dismissal of its complaint against the City of Chattanooga, a co-defendant in the action and plaintiff's cross-appeal asserting that its judgment was for an inadequate amount.
 
 
 2
 The case was tried to the District Judge, whose opinion is reported as Texas Tunneling Co. v. City of Chattanooga, 204 F.Supp. 821 (E.D.Tenn.1962). We affirm dismissal of the complaint as to the City of Chattanooga on the District Judge's opinion. We express our agreement with his method of calculating damages, but our finding of no liability makes consideration of damages unnecessary. Since the District Judge's opinion comprehensively sets out the facts of the case, we will discuss them only to the extent necessary for exposition of our view of the applicable law. Defendant, City of Chattanooga, having been dismissed, we will refer to appellants, William A. Havens, et al. d/b/a Havens and Emerson, as the defendant.
 
 
 3
 In planning for the construction of the interceptor sewer, the City of Chattanooga, employed several engineering firms to make the studies, designs, and reports necessary to carry out the project. Included in this work was the designing of a tunnel through a hill known as Stringer's Ridge. This work was done by defendant, Havens and Emerson. Also employed by the City was the engineering firm of Law-Barrow-Agee, whose function was to make test borings in the area of Stringer's Ridge to determine the subsurface conditions of the hill through which the tunnel was to be dug. Cores containing samples of the subsurface material were recovered in the test boring.
 
 
 4
 At the conclusion of the Law-Barrow-Agee test borings, the findings thereof were compiled in a report made by Law-Barrow to defendant, Havens and Emerson. This report is identified as Exhibit 6. Based upon the information given in this Exhibit 6, defendant, in July 1955, prepared a summary report to the City entitled, "Test Borings Stringer's Ridge Sewer Tunnel Boring Logs," which is identified in the record as Exhibit 4.
 
 
 5
 The failure of defendant to include in its summary (Exhibit 4) information about core recoveries contained in the Law-Barrow report is the conduct which plaintiff here claims as the tort committed against it. The omitted information was the percentage of core recoveries made by Law-Barrow at points identified as Test Bore 31 and Test Bore 32. In all other respects, defendants report Exhibit 4 was a correct transcription and diagram of the data that Law-Barrow reported to it. The District Judge so found. Defendant admitted that the omission was a mistake and was the consequence of an error committed by one of its draftsmen. The District Judge's view of this omission was as follows:
 
 
 6
 "[T]he only conclusion the Court can draw from the record in this case is that by oversight or at most simple and unintentional carelessness, one of the defendants' draftsmen, who was never identified, failed to include the percentage of core recovery on Exhibit No. 4, although this information was contained in the Law-Barrow-Agee Test Boring Record, Exhibit No. 6, from which he obtained his information. Likewise, by unintentional oversight this omission was not noticed by other members of the defendants' firm, and the drawing was delivered to the City with this information omitted. The defendants had no knowledge of this omission until it was called to their attention by the filing of this lawsuit long after the alleged loss by the plaintiff. If this action is based upon a fraudulent or intentional tort, it is the opinion of the Court that it should be dismissed." (204 F.Supp. 826, 827)
 
 
 7
 The foregoing Exhibit 4, as well as other engineering data, such as surveys, drawings, and specifications were all lodged with the City Engineer and made available for contractors bidding on the construction contract for the interceptor sewer. Plaintiff's asserted cause of action is grounded in the claim that, as a subcontractor for digging the tunnel, it was misled by the omission in Exhibit 4 as to the character of the ground through which it had to dig; that, as a consequence, it underestimated its costs in negotiating its subcontract and suffered a substantial loss in fulfilling the contract. Plaintiff claims that knowledge of core recoveries, both as to their existence and their extent, is of substantial value to one estimating the cost of tunneling through the ground in which the test borings had been made. There was evidence to sustain plaintiff's claim in this regard. While there were no contractual relations between defendant and the general contractor, or between defendant and the plaintiff subcontractor, it is clear that defendant knew that its survey and report would be made available to, and examined by, those who were to bid on the work involved. Exhibit 4, however, had, on its face, a note reading as follows:
 
 
 8
 "This information is furnished for the convenience of bidders and is not a part of contract 15. This information is not guaranteed and any bid submitted must be based on the bidders own investigations and determinations."
 
 
 9
 Like language of warning was contained in the general contract, but plaintiff's witnesses testified that such caveats are generally ignored by contractors who customarily rely on the information notwithstanding the warnings. The general contract contained the following:
 
 
 10
 "3. Examination of Documents and Site of Work:
 
 
 11
 "Bidders are advised that the plans, specifications, estimates, addenda and bulletins of the Engineer shall constitute all the information which the City will furnish. * * * Bidders are required, prior to submitting any proposal * * * to examine carefully all estimates open for examination and all plans on file in the Engineer's office. * * * Bidders shall rely exclusively upon their own estimates, investigation and other data which are necessary for full and complete information upon which the proposal may be based.
 
 
 12
 "11. Borings
 
 
 13
 "(a) Borings along the line of the proposed sewer have been made for the use of the Engineer in determining the approximate extent of rock.
 
 
 14
 "(b) The City does not warrant or guarantee the accuracy of any information, including ground water levels, or samples which it may have obtained from borings or otherwise as to kind or condition of the materials to be excavated. (Emphasis supplied)
 
 
 15
 "(c) If the bidder wishes to obtain additional information as to soil conditions, the City will afford him an opportunity, at his own expense, to make additional borings on the site.
 
 
 16
 "(d) Data on borings are shown on a drawing that is available for general information only. This drawing is not a part of the Contract Documents."
 
 
 17
 It was shown that drillers making test bores generally use two types of drills — a diamond core drill for boring through rock, and a "fishtail" drill for lighter material. Cores are more likely to be recovered when a diamond drill is used than when the fishtail variety is employed. Plaintiff and its witnesses stated that in addition to knowledge as to the existence of core recoveries, it is important to a contractor to know where diamond drills were used and helpful to inspect any core recoveries that were obtained. Daily logs of the work done by the Law-Barrow drillers did show that diamond drills were used to some extent at Test Bores 31 and 32. However, in making the final report on its work (Exhibit 6), Law-Barrow failed to show all of the places where it had done diamond core drilling. Havens and Emerson's accused report (Exhibit 4) was taken from the Law-Barrow Exhibit 6 and faithfully reported and diagrammed all of the information concerning diamond core drilling that was shown on Exhibit 6. The District Judge held that defendant was entitled to rely on the Law-Barrow report (Exhibit 6) and could not be charged with omissions originating therein. Both Exhibit 4 and Exhibit 6 set forth diagrammatically and with descriptive language the character of the subsurface material that would be encountered at various points in digging the tunnel.
 
 
 18
 The charges of the plaintiff against the City and against Havens and Emerson were summarized by the District Judge under four headings: (1) Omission from Exhibit 4 of the fact that diamond core drilling was done at Test Bores 31 and 32; (2) Omission from Exhibit 4 of the percentage of core recoveries; (3) Failure to mention the retention and availability of core samples recovered, and (4) Omission of information contained in the original Law-Barrow field reports which, if included in Exhibit 4, would have indicated a discrepancy between the two reports.
 
 
 19
 The complaint against the City was, as stated, dismissed in its entirety. Further, for reasons set forth in his reported opinion, the District Judge exonerated the defendant of the above charges, (1), (3), and (4). Liability in tort was cast upon defendant, Havens and Emerson, solely on charge (2) — failure to report the percentage of core recovery experienced by Law-Barrow in its test boring. We think it important to mention here that cores were recovered and were retained by the City. These, with complete and full data on the percentage of recovery, were located and on file at the City Engineer's office, and were available to plaintiff's representatives when they came to Chattanooga to figure the cost of the job.
 
 
 20
 The question before us is whether the present law of Tennessee recognizes a cause of action in tort, in favor of one not in privity with the alleged tort feasor, based on a negligent as opposed to an intentional misrepresentation: specifically, whether such law now equates the innocent mistake of this defendant with conduct that, in the tradition of the law, has allowed recovery for fraudulent and deceitful misrepresentation. In answering this question, it is imperative that we first determine whether defendant's report (Exhibit 4), when viewed in its company with other documents and data relating to the test bores, can be said to be a false representation, calculated to deceive and actually deceiving a person informed on the subject of its content. It is clear to us, as it was to the District Judge, that the absence from Exhibit 4 of information that it could or should have contained, was not the product of wilfulness, intentional or implied fraud or recklessness. We are satisfied that, in its context, the document in question was not tortiously false or misleading.
 
 
 21
 The District Judge in his painstaking opinion learnedly reviews the common law action for fraud and deceit, an action that does not require privity between a wrongdoer and his victim. Seeking to ascertain the law of Tennessee he begins, as do most writers on the subject, with some discussion of the case of Derry v. Peek, 14 App.Cas. 337, 58 L.J.Ch. 864 (1889), "the case most widely cited and quoted from in this field." The case held:
 
 
 22
 "First, in order to sustain an action of deceit, there must be proof of fraud, and nothing short of that will suffice. Secondly, fraud is proved when it is shown that a false representation has been made (1) knowingly, or (2) without belief in its truth, or (3) recklessly, careless whether it be true or false. Although I have treated the second and third as distinct cases, I think the third is but an instance of the second, for one who makes a statement under such circumstances can have no real belief in the truth of what he states." (14 App.Cas. 374)
 
 
 23
 To the extent that Tennessee has considered the doctrine of Derry v. Peek, it has approved it. In Shwab v. Walters, 147 Tenn. 638, 644, 251 S.W. 42, 44 (1922), the Court said:
 
 
 24
 "This court has more than once in unreported cases approved and followed the rules laid down by Lord Herschell in Derry v. Peek, L.R. 14 App.Cas. 337 as follows:" (Here follows the language above quoted.)
 
 
 25
 No repudiation of its adherence to Derry has yet been announced by the Tennessee Court. In its subsequent decision in Crouch v. Gray, 154 Tenn. 521, 536, 290 S.W. 391, 395, 50 A.L.R. 1023 (1926), the Tennessee Court again expressed its view that:
 
 
 26
 "All actionable wrongs are either torts, contracts, or crimes. If this demand may be held to be in tort, it must be based on deceit — fraudulent misrepresentation — and it is well settled that the element of will or intent is essential to such a charge." (Emphasis supplied.)
 
 
 27
 It is important to interpolate at this point the District Court's acknowledgement: "If this action is based upon a fraudulent or intentional tort, it is the opinion of the Court that it should be dismissed." 204 F.Supp. 827 (Emphasis supplied.)
 
 
 28
 It is argued, however, that other Tennessee decisions, without expressly saying so, have by-passed Derry v. Peek and established a tort action for negligent misrepresentation unburdened of the criteria which Derry says are essential. In the alternative, it is asserted that courts, including Tennessee, have found ways to continue lip service to Derry by fitting into its category of "implied fraud" innocent mistakes such as this defendant committed. Cited are Southern Foundry v. Cowan Stone Co., 188 Tenn. 576, 221 S.W.2d 809 (1949); State ex rel. Harbin v. Dunn, 39 Tenn.App. 190, 282 S.W.2d 203 (1955); Jackson v. B. Lowenstein & Bros. Inc., 175 Tenn. 535, 136 S.W.2d 495 (1940); Justus v. Wood, 209 Tenn. 55, 348 S.W.2d 332, 349 S.W.2d 793 (1961); Figuers v. Fly, 137 Tenn. 358, 193 S.W. 117 (1916); Lowe v. Wright, 40 Tenn.App. 525, 292 S.W.2d 413 (1956); Tennessee Hospital Service Ass'n. v. Strang, 49 Tenn.App. 263, 354 S.W.2d 488 (1961); Dickle v. Nashville Abstract Co., 89 Tenn. 431, 14 S.W. 896 (1890); Denton v. Nashville Title Co., 112 Tenn. 320, 79 S.W. 799 (1903); Equitable Building & Loan Ass'n. v. Bank of Commerce & Trust Co., 118 Tenn. 678, 102 S.W. 901, 12 L.R.A.,N.S., 449 (1907). We need not lengthen this opinion to set out the facts of these cases, some of which are discussed in the District Court opinion. We are satisfied that the facts of those cases are such that they cannot be considered a rejection of Derry v. Peek, nor do they provide precedent for a judgment favoring plaintiff in the case at bar.
 
 
 29
 The recent Tennessee case of Howell v. Betts, 362 S.W.2d 924 (1962), deals with an action for negligent misrepresentation. While its facts may permit some distinction from the case at bar, it is relevant to, and not without some support for defendant-appellant's position here. In that case a plaintiff was injured by an erroneous survey made for a former purchaser of land, but was held not entitled to recover from the erring surveyor. The court emphasized the lack of privity between the plaintiff and the engineer who had made the survey for plaintiff's far-removed predecessor in title. While the court emphasized the distance in time and transactions that had intervened between the preparation of the erroneous survey and its use by the current buyer, the real difference is only one of degree. Any sophisticated surveyor will know that his survey, though prepared for a particular transaction, will become a part of the file containing the title papers to the land surveyed and will most likely be passed on from one owner to the next. Such successor owners often do rely upon such surveys even though they have no contractual rights in them. This case, involving a survey, was decided subsequent to the District Court decision here and hence was not discussed by the District Judge. It is significant, however, that in it, the Tennessee Court relied upon the case of Ultramares Corp. v. Touche, 225 N.Y. 170, 174 N.E. 441, 74 A.L.R. 1139 (1931), which the District Judge in the case before us found to be of doubtful authority. In the Ultramares case, Justice Cardozo, speaking for the New York Court of Appeals, held that an accounting firm could not be held liable for negligent misrepresentation to plaintiffs, who had extended credit in reliance on an audit prepared for one of the accounting firm's clients; the defendant accounting firm had clear knowledge that copies of the audit were to be exhibited "to banks, creditors, stockholders, purchasers, or sellers, according to the needs of the occasion, as the basis of financial dealings." Justice Cardozo emphasized that while the accounting firm knew of the uses to which its audit would be put, it had no knowledge of the specific persons or firms who might rely on it in extending credit to its client, a mercantile company. Though Cardozo had already written his landmark decision of MacPherson v. Buick Motor Co., 217 N.Y. 382, 111 N.E. 1050, L.R.A.1916F, 696 (1916), in which he struck down the need for privity between the parties to certain tort cases, he drew the line at the Ultramares situation. While observing that, "[t]he assault upon the citadel of privity is proceeding in these days apace," he held that the defendant accounting firm could not be held liable for simple negligence to a plaintiff who was neither specifically foreseeable by it nor in privity with it. He stated:
 
 
 30
 "In the case at hand, the service was primarily for the benefit of the Stern Company, a convenient instrumentality for use in the development of the business, and only incidentally or collaterally for the use of those to whom Stern and his associates might exhibit it thereafter. Foresight of these possibilities may charge with liability for fraud. The conclusion does not follow that it will charge with liability for negligence." 174 N.E. 446 (Emphasis supplied.)
 
 
 31
 Though the above reasoning was not accepted by the District Court, the case in which it was employed, the Ultramares case, has, since the opinion below, been cited by the Supreme Court of Tennessee in the above-mentioned case of Howell v. Betts. In Howell, the Tennessee Court employed dictum indicating that, given the proper circumstances, there could be an action for negligent misrepresentation without privity between a plaintiff and an alleged tort feasor. It concluded, however, that on the facts before it, that "we think the rule of liability cannot be extended to a case like [this]" (362 S.W.2d 926). This is essentially our view of the case before us. For us to impose liability on the defendant would require this Court to fashion a rule not yet adopted in Tennessee. Under the facts of this case, we decline to do so.
 
 
 32
 Because its facts are in part responsible for our disinclination to choose this case as a vehicle in which to make a new advance in the law of torts, we indulge in some further recitation of such facts.
 
 
 33
 1. Texas Tunneling Company's representatives arrived in Chattanooga prior to lunch time on the day they negotiated the subcontract. By nightfall they had successfully negotiated to dig the tunnel for the sum of $106,384. Their only investigation appeared to consist of talking with the general contractor, Stein, looking at Exhibit 4, looking over the site, and going to lunch with some representatives of the other interested parties. Plaintiff's witnesses testified that knowledge of the existence, nature and extent of core recoveries is critical to fixing a price for such a job as is involved. Though no such information was provided by Exhibit 4, plaintiff's representatives made no inquiry of anyone as to whether such information was available. It was, in fact, available to him at the City Engineer's office. There was testimony that reports, such as Exhibit 4, would ordinarily contain the information that patently was missing from this report. Aware of this, plaintiff's men relied entirely on their assumptions and did not make any effective inquiry on this critically important subject.[1]
 
 
 34
 2. The testimony of Gilbert Stein, the general contractor on the job, states that contractors rely on such reports as the accused Exhibit 4. In his words, "we assume that if he didn't indicate core drilling on here * * * he didn't have any more information." The fact is that Exhibit 4 did have information as to core drilling, but there was an innocent omission as to the place of it. Stein indicated that he didn't ask for any core driller's records of core recoveries. When asked if Exhibit 4 gave him sufficient information to base a bid, he answered: "We, we're gamblers, contractors are gamblers, and I thought I had enough information to base a bid, and when I gave Mr. Turner (Texas Tunneling Company's representative) the information I had, my opinion of it, he concurred in it." In answer to a question, as to whether he would have bid if they had not been given any information, he answered: "That's right. I've dug up about half the country. I have some idea of what's around." He answered the question, "You are not complaining about lack of information?" with the laconic observation, "My part came out all right."[2]
 
 
 35
 3. Although, in its lawsuit, plaintiff attributed its troubles to the omission in Exhibit 4, it weathered them although taking more time than it had anticipated. It completed the job apparently without complaint to the City or the defendant that a wrong had been done to it by Exhibit 4. Defendant's first knowledge of the omission in Exhibit 4 came when it was sued by plaintiff two years after the work had been completed.
 
 
 36
 4. The District Judge found as a matter of fact and law that neither the City nor defendant committed an actionable wrong against plaintiff in failing, by Exhibit 4 or otherwise, to tell plaintiff that recovered cores had been retained and were available for inspection at the City Engineer's office. Here again plaintiff asserts a custom of contractors which it claims permitted it, absent affirmative advice that cores had been retained, to assume that there were none available. We find some difficulty in differentiating between this allegedly withheld information and that which was found to be the basis for actionable tort. On this subject, the District Judge states:
 
 
 37
 "The absence of an express statement that core samples existed is interpreted by the plaintiff to imply that such samples did not exist. Contrary to the inference sought to be drawn by the plaintiff from this language, the Court would conclude that the language expressly states that core drilling had been performed and should therefore suggest to the plaintiff, a firm experienced in such matters, the possible existence of such samples." (Not contained in opinion as printed.)
 
 
 38
 5. The accused Exhibit 4, apart from the omitted information as to the percentage of core recovery and diamond drilling, did purport to show by diagram and descriptive language the materials that would be encountered at tunnel level. Plaintiff insisted that this information was inaccurate, yet the District Judge found as a fact:
 
 
 39
 "Exhibit 4 did accurately reproduce the statement of materials to be encountered at tunnel level in Test Bores 31 and 32 as those materials were listed upon the Law-Barrow-Agee Test Boring Record. * * * Moreover, the Court is of the opinion that the evidence preponderates in favor of the defendants upon the proposition that there was no significant difference between the materials described in Exhibit No. 4 and those described in Exhibit No. 5 (admittedly complete as to percentage of core recovery and the extent of diamond drilling) at the tunnel level on these respective test bores."
 
 
 40
 And further, on this same subject, found as a fact:
 
 
 41
 "The materials verbally described in Exhibit No. 4 were substantially the same materials as were actually encountered in digging the tunnel in the area of the test bores. * * *"
 
 
 42
 He was of the opinion, however, that knowledge of whether such materials had been diamond cored and the percentage of core recovery would also be necessary to a complete description.
 
 
 43
 6. The statements in Havens and Emerson's summary (Exhibit No. 4) contained no percentages of core recoveries. It said nothing as to whether there had or had not been recoveries or as to any percentage thereof. It contained no representation, true or false, on the subject. It becomes a false representation, asserts the plaintiff, because normally and usually the information (percentage of core recoveries) is contained in such a report as Exhibit No. 4. It is contended, therefore, that, from the absence of it, plaintiff and other contractors assume that no such information is available. Plaintiff's witnesses also asserted that if core samples are retained, such fact is customarily made known to contractors. The District Court, however, found no actionable misrepresentation stemming from the failure to make mention of the existence of core recoveries, but did find a tort based on a failure to include the percentages of such recoveries.
 
 
 44
 7. We again mention that Exhibit No. 4 contained the caveat that:
 
 
 45
 "This information is furnished for the convenience of bidders and is not a part of Contract 15. This information is not guaranteed and any bids submitted must be based on the bidders own investigation and determinations."
 
 
 46
 Plaintiff and Stein and their witnesses dispose of the foregoing by again relying on what is customarily done by bidders and subcontractors. It is apparently assumed that bidders just have not the time to check and, as Stein stated, "contractors are gamblers." We are cited no law which gives legal sanction to contractors' disdain to concern themselves with such language. We need not here consider whether a victim of actual fraud and deceit would or should be exonerated if he were guilty of such cavalier ignoring of a plain warning. Such is not the case before us. Further, we recognize that one who had hired an engineer or was otherwise in privity with him might be justified in ignoring a caveat and in all events it would be unlikely that the employer of such engineer would accept an unguaranteed report. Having "gambled," as is the claimed custom of such contractors, should plaintiff be permitted damages for a bad gamble to be recovered from one who promised him nothing and whose only fault was one of mere oversight?
 
 
 47
 The District Judge's finding that plaintiff was not guilty of contributory negligence is not charged as error, so we do not consider the subject. We are of the opinion that up to now the Tennessee Courts have not extended the reach of tort claims for fraud and deceit to encompass a situation such as is involved here. In his excellent and learned opinion, the District Judge makes the needed extension as being "more consonant with the legal and practical considerations obtaining in Tennessee today." We cannot, on this record, join in such extension. We are not persuaded by Restatement of Torts § 552 that we should do so. (See also 77 Harv.L.Rev. 773 (1964))
 
 
 48
 We have set forth the above numbered observations as background to our saying that if new ground is to be broken, this is not the case in which to begin. As did the Supreme Court of Tennessee in Howell v. Betts, supra, "[o]n principle and authority, we think the rule of liability cannot be extended to a case like that before us."
 
 
 49
 The judgment of the District Court dismissing the complaint as to the City of Chattanooga is affirmed; the judgment in favor of plaintiff against defendants William A. Havens, et al., doing business as Havens and Emerson, is reversed with direction to dismiss the complaint as to them.
 
 
 
 Notes:
 
 
 [1]
 On this subject, the District Judge, in exculpating the City, said: "As testified by Mr. Turner, President of Texas Tunneling Company, although he knew the City of Chattanooga was the owner of the job, neither he nor anyone on behalf of the plaintiff ever at any time before the subcontract was made contacted any city official or sought any information from the City. * * * No inquiry was made of the City with regard to the existence or non-existence of any test boring samples. Mr. Barnes, the City Engineer, testified that these samples were in his office, were available for inspection, and were in fact shown to other bidders who did inquire about them."
 
 
 [2]
 Plaintiff's subcontract price for digging the tunnel was $106,384. The bid of general contractor Stein for the entire work was $270,395, including the tunnel portion bid at $234,240. The high bid for the job had been $418,118 including the tunnel portion bid at $377,712. There were at least a half dozen bidders. None, but Stein and plaintiff, gave testimony that Exhibit 4 was misleading